LYNETTE M. MATLOCK,       )
                                 )
        Plaintiff,            )
                                 )
        vs.                  )         **Case No. 1:07CV 153 LMB**
                                 )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
                                 )
        Defendant.        )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Lynette M. Matlock for Disability Insurance Benefits under Title II of

the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case

has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice

Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has

filed a Brief in Support of Plaintiff's Complaint. (Document Number 11). Defendant has filed a

Brief in Support of the Answer. (Doc. No. 14).

## Procedural History

On September 14, 2005, plaintiff filed her application for benefits, claiming that she

became unable to work due to her disabling condition on December 18, 2001. (Tr. 131-33, 78-

85). This claim was denied initially, and following an administrative hearing, plaintiff's claim was

denied in a written opinion by an Administrative Law Judge (ALJ), dated June 15, 2007. (Tr. 15-

22). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on September 4, 2007.  (Tr. 6, 2-5).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on February 9, 2007.  (Tr. 25).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Jeffrey

Magrowski.  (Id.).  Medical expert Dr. Morris Alex was present by telephone.  (Id.).  The ALJ

began the hearing by admitting the exhibits into the record.  (Tr. 27).

Plaintiff's attorney then examined plaintiff, who testified that she received a workers'

compensation injury on December 18, 2001.  (Tr. 28).  Plaintiff stated that she fell down school

bus steps and injured her back.  (Id.).  Plaintiff testified that Dr. Scott Gibbs performed back

surgery in June of 2003.  (Id.).  Plaintiff stated that her back symptoms have not improved much

since that time.  (Id.).

Plaintiff testified that she experiences pain in her low back around her buttocks, down her

left leg, and into her toes, causing her toes to become numb.  (Id.).  Plaintiff stated that she has

only experienced numbness in her toes on one occasion.  (Tr. 30).  Plaintiff testified that her low

back pain varies, depending on her activities.  (Id.).  Plaintiff stated that her average pain level

ranged from a two to ten on a scale of one to ten.  (Id.).  Plaintiff testified that her pain increases

when she stands.  (Id.).  Plaintiff stated that she is able to stand in one place for thirty minutes.

(Tr. 31).  Plaintiff stated that her low back pain is constant.  (Id.).  Plaintiff testified that walking

increases her back pain.  (Id.).  Plaintiff stated that it is extremely difficult for her to bend over.

(Id.).  Plaintiff testified that when her back pain increases, it goes down into her left leg.  (Id.).

Plaintiff stated that she has experienced pain in her right hip on one or two occasions.  (Id.).

Plaintiff testified that since her surgery, she has tried every method possible to alleviate her

pain.  (Id.).  Plaintiff stated that, at the time of the hearing, she was using "pretty heavy duty" pain

medication, including pain patches.  (Id.).  Plaintiff testified that the most of the medication she

takes helps relieve her pain.  (Id.).

Plaintiff stated that she had been experiencing terrible dizzy spells, even while taking

medication to treat the dizziness.  (Tr. 32).  Plaintiff testified that she has fallen due to dizziness.

(Id.).  Plaintiff stated that she had seen her doctor twice in the week prior to the hearing, and that

he had taken her off Cymbalta.[1]  (Id.).

Plaintiff testified that in a typical day, she mostly lies in bed, because that is the only way

she gets any relief from her back pain.  (Id.).  The ALJ noted that plaintiff became upset and was

tearful during her testimony.  (Tr. 33).

Plaintiff testified that she tries to help with the household chores as much as possible.

(Id.).  Plaintiff stated that her husband and daughter usually wash the dishes.  (Id.).  Plaintiff

testified that she does some laundry, although her husband and daughter help her carry the

laundry.  (Id.).  Plaintiff stated that she also takes care of her two small dogs by feeding them and

washing them.  (Id.).  Plaintiff testified that she is no longer able to vacuum because it is too hard

on her back.  (Id.).  Plaintiff stated that she occasionally sweeps.  (Id.).  Plaintiff stated that if she

does too many of the household chores, it causes her to experience pain. (Tr. 34).  Plaintiff

---

[1]Cymbalta is indicated for the treatment of major depressive disorder.  See Physician's Desk Reference (PDR), 3430 (59th Ed. 2005).

testified that she has a small garden that she tries to take care of in the summer. (Id.). Plaintiff stated that caring for the garden in combination of other factors causes her to experience pain in her low back. (Id.).

Plaintiff testified that she shops for groceries with her husband once a week. (Id.). Plaintiff stated that her husband lifts the heavier items. (Id.). Plaintiff testified that she is occasionally unable to walk around the entire store of a large shopping center such as Wal-Mart. (Id.).

Plaintiff stated that she rarely eats breakfast or lunch. (Tr. 35). Plaintiff testified that her only meal is usually dinner. (Id.). Plaintiff stated that her husband usually cooks, although she occasionally cooks. (Id.). Plaintiff testified that she does not cook often due to her low back pain. (Id.).

Plaintiff stated that after her back injury, she took her bath tub out of her bathroom because she was unable to get in and out of the tub due to her back pain. (Id.).

Plaintiff testified that, prior to her back injury, she was very active. (Id.).

Plaintiff stated that she experiences problems with her memory. (Tr. 36). Plaintiff testified that, for example, she has difficulty remembering specific dates. (Id.). Plaintiff stated that she also experiences difficulty focusing or concentrating. (Id.). Plaintiff testified that she is unable to watch a two-hour movie. (Id.). Plaintiff stated that she has problems expressing herself and getting words out. (Id.).

Plaintiff testified that she experiences panic attacks. (Id.). Plaintiff stated that she has gone to the hospital on several different occasions due to panic attacks. (Id.). Plaintiff testified that she experienced increased panic attacks in the weeks prior to the hearing. (Tr. 37). Plaintiff

stated that she experiences panic attacks when she worries about things too much and becomes upset.  (Id.).  Plaintiff testified that when she experiences a panic attack, it starts with wheezing in her chest and an inability to get her breath, and then she cries, becomes nervous, and does not want to be around anyone.  (Id.).

The ALJ then examined plaintiff, who testified that she had been crying frequently for two to three weeks prior to the hearing.  (Id.).  Plaintiff rated her pain while sitting during the hearing as a five on a scale of one to ten.  (Tr. 38).  Plaintiff noted that she had taken medication.  (Id.).  Plaintiff testified that her pain might be relieved somewhat if she walked around the room.  (Tr. 39).

Plaintiff stated that she saw a psychiatrist for her depression but she stopped seeing him due to an inability to afford treatment.  (Id.).  Plaintiff testified that she did not see a counselor because she was unable to afford treatment.  (Id.).  Plaintiff stated that she saw the psychiatrist seven to eight times in the course of a year.  (Tr. 40).  Plaintiff testified that she was beginning to feel better with treatment.  (Id.).

Plaintiff stated that she had not looked for work in the year prior to the hearing.  (Id.).

Plaintiff testified that she did not believe she was capable of working a light sit-down job where she would not have to lift more than twenty pounds for eight hours a day, five days a week, due to her pain.  (Tr. 41).

The ALJ then examined medical expert Morris Alex, M.D., who stated that he would like to know the medications plaintiff was taking.  (Tr. 42).  Plaintiff's attorney indicated that plaintiff

was taking the following medications: Lorazepam (30 mg),[2] Trazodone (50 mg),[3] Restoril (30 mg),[4] Levaquin (750 mg),[5] Ambien (12.5 mg),[6] Antivert (25 mg),[7] Cymbalta (60 mg), Percocet (650 mg, four times a day),[8] Neurontin (800 mg),[9] Soma (350 mg, six times a day)[10] and Fentanyl patches.[11]  (Tr. 42-43).  Plaintiff testified that she was taken off the Cymbalta to see if that would decrease her dizzy spells.  (Tr. 43).

The ALJ then examined plaintiff's husband, James Matlock, who testified that he had been married to plaintiff for 21 years.  (Id.).  Mr. Matlock stated that he had heard his wife's testimony and that her testimony was correct as far as he was aware.  (Id.).  Mr. Matlock testified that plaintiff is able to help with the laundry by putting the clothes in the machine and helping to fold it.  (Tr. 44).  Mr. Matlock testified that plaintiff does not wash dishes because she is unable to

---

[2]Lorazepam is indicated for the treatment of anxiety.  See PDR at 2966.

[3]Trazodone is indicated for the treatment of depression.  See PDR at 3296.

[4]Restoril is indicated for the treatment of insomnia.  See PDR at 1926.

[5]Levaquin is indicated for the treatment of bacterial infections.  See PDR at 2503.

[6]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2980.

[7]Antivert is an antihistamine indicated for the treatment of nausea, vomiting and dizziness. See PDR at 2578.

[8]Percocet is indicated for the relief of moderate to moderately severe pain.  See PDR at 1223.

[9]Neurontin is indicated for the treatment of postherpetic neuralgia.  See PDR at 2590.

[10]Soma is indicated for the treatment of acute, painful musculoskeletal conditions.  See PDR at 1976.

[11]The Fentanyl patch is a transdermal system providing continuous systemic delivery of Fentanyl, a potent opioid analgesic.  It is indicated for the management of chronic pain.  See PDR at 1731-33.

stand in one place long enough.  (Id.).  Mr. Matlock stated that he sweeps and dusts.  (Id.).

Mr. Matlock stated that the heaviest item plaintiff was able to lift was a gallon of milk or a case of

soda.  (Id.).  Mr. Matlock testified that he picks up the heavy items when he and plaintiff shop for

groceries.  (Id.).

Mr. Matlock stated that plaintiff gets upset approximately four to five times a week.  (Id.).

Mr. Matlock testified that plaintiff has difficulty remembering things.  (Id.).  Mr. Matlock stated

that plaintiff had difficulty remembering the date and time of the hearing.  (Id.).  Mr. Matlock

testified that he and plaintiff get into arguments, which upsets plaintiff.  (Tr. 45).  Mr. Matlock

stated that plaintiff is sometimes able to remember and understand instructions if he tells her how

to do something.  (Id.).  Mr. Matlock testified that he occasionally has to go over things two or

three times before plaintiff is able to understand.  (Id.).

The ALJ then examined Mr. Matlock, who testified that plaintiff becomes irritated with

something he has said about four to five times a week.  (Id.).  The ALJ noted that plaintiff

appeared tearful during the hearing.  (Id.).  Mr. Matlock testified that plaintiff appeared this way

occasionally at home, when she was upset.  (Id.).  Mr. Matlock testified that plaintiff's pain level

during the hearing was about that of a normal day.  (Id.).  Mr. Matlock stated that he believed the

hearing upset plaintiff, causing her to appear the way the ALJ described.  (Tr. 46).  Mr. Matlock

testified that plaintiff did not particularly like to talk about her condition and how it affects her.

(Id.).

Mr. Matlock stated that he did not talk to plaintiff's psychiatrist about her condition when

she was being treated by a psychiatrist.  (Id.).

Mr. Matlock testified that plaintiff was not able to do much of anything at home.  (Id.).

Mr. Matlock stated that plaintiff's testimony regarding her limitations was accurate. (Id.).

The ALJ then re-examined Dr. Alex, who testified that he had reviewed plaintiff's medical records, other than records submitted by plaintiff immediately prior to the hearing that had not reached the file. (Tr. 47). Dr. Alex stated that, with the amount of tranquilizers and sedatives that plaintiff was taking, he was "not sure how in the hell she's functioning." (Id.). Dr. Alex stated that plaintiff was taking medications that would cause a lot of sleepiness, drowsiness, confusion, and other side effects. (Id.). Plaintiff stated that, even while taking all of these medications, she did not sleep well. (Tr. 48). Plaintiff's attorney stated that all of plaintiff's medications were prescribed by the same physician, Dr. Phillips. (Id.).

Dr. Alex then summarized plaintiff's medical records. (Tr. 48-50). The ALJ noted that the state agency indicated that due to plaintiff's disorders of the back, plaintiff was limited to light work. (Tr. 50). Specifically, the state agency found that plaintiff was limited to lifting twenty pounds occasionally, and ten pounds frequently; occasional stooping, kneeling, crouching, crawling, and climbing ladders; and avoiding concentrated exposure to vibration. (Id.). Dr. Alex testified that these restrictions were reasonable, although plaintiff should not climb ladders at all. (Id.). The ALJ stated that the state agency found that, due to plaintiff's affective disorder, plaintiff had moderate limitations in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (Id.). Dr. Alex testified that, if plaintiff was taking all of her medications at that time, then there would be no question that plaintiff would be limited as the state agency indicated. (Tr. 51). Dr. Alex stated that, from the way plaintiff sounded at the hearing, he believed plaintiff was markedly limited. (Id.).

Dr. Alex stated that it would be advisable to administer a psychological MMPI due to the problem of the drugs plaintiff was taking and the absence of physical findings. (Id.).

The ALJ then examined vocational expert Jeffrey Magrowski, who testified that if plaintiff's testimony regarding her limitations due to her pain, anxiety, and depression were credible, plaintiff would not be able to perform any jobs. (Tr. 53). Mr. Magrowski stated that plaintiff demonstrated difficulty in answering the ALJ's questions and it appeared that plaintiff was not thinking clearly and had some memory problems. (Id.).

The ALJ next asked Mr. Magrowski to consider the limitations found by the state agency and agreed to by Dr. Alex, with the caveat that plaintiff was affected by the medication she was taking. (Id.). Specifically, the ALJ asked Mr. Magrowski to assume plaintiff had the capacity to lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand and walk each about six hours in an eight-hour workday with normal breaks; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolding; never engage in work where balancing of the body was critical to the performance of the duties; occasionally stoop, kneel, crouch, or crawl; avoid concentrated exposure to extreme cold and vibration; low density hum from a machine could be tolerated but anything that would jolt and shake the body violently would have to be avoided; moderate limitation in the ability to understand and remember detailed instructions and carry out detailed instructions; and moderate limitation in the ability to maintain attention and concentration. (Tr. 54). Mr. Magrowski testified that plaintiff would be unable to perform any of her past work with these limitations. (Id.). Mr. Magrowski stated that plaintiff would be able to perform some light work, such as assembly of small products (3,000 positions in the state; 300,000 nationally), packing work (2,000 in the state; 200,000 nationally), and light stocking

work (2,000 in the state; 100,000 nationally).

The ALJ next asked Mr. Magrowski to assume plaintiff was limited to sedentary work and required a job that would not keep her on her feet for longer than two hours in an eight-hour workday. (Tr. 55). Mr. Magrowski testified that plaintiff would be capable of performing some assembly work (1,500 in the state; over 100,000 nationally), some basic clerical work (1,000 in the state, over 100,000 nationally), and packing or sorting work (1,000 in the state; over 25,000 nationally). (Id.).

Plaintiff interrupted at this point, stating that she has arthritis in her arms, which started shortly before the hearing and comes and goes. (Tr. 56).

Mr. Magrowski testified that the full range of sedentary, unskilled work would not be significantly eroded by any of plaintiff's non-exertional limitations. (Id.). Mr. Magrowski stated that plaintiff's allegations of hand problems that would prevent her form using her hands for repetitive actions would preclude most sedentary work. (Id.).

**B.    Relevant Medical Records**

On January 30, 2002, plaintiff presented to Joel West Ray, M.D., for evaluation of a work-related injury. (Tr. 470-73). Plaintiff reported that she fell down the stairs of a bus and injured her back on December 18, 2001. (Tr. 470). Plaintiff complained of pain in her back and down her left leg. (Id.). Dr. Ray noted that plaintiff had undergone an MRI on January 9, 2002, which revealed left-sided disc protrusions at L3-4 and L5-S1.[12] (Id.). Dr. Ray recommended that

---

[12]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information

plaintiff undergo a cervical MRI scan, and a series of injections and physical therapy for her lumbar spine.  (Tr. 473).

Plaintiff presented to Dr. Ray on March 1, 2002, at which time Dr. Ray noted that plaintiff had been suffering from abdominal problems, which made it difficult for her to progress.  (Tr. 467).  Dr. Ray stated that a cervical MRI revealed a minimal bulge at C6-7 and that this problem should resolve with physical therapy and should not require surgery.  (Id.).  Dr. Ray indicated that plaintiff had stopped physical therapy after two weeks due to lack of improvement.  (Id.).  Dr. Ray recommended that plaintiff see the physical therapist again to develop a plan with regard to her low back.  (Tr. 463).

On March 13, 2002, Dr. Ray stated that plaintiff had experienced significant improvement in her GI symptoms and was ready to start physical therapy.  (Tr. 465).  Dr. Ray indicated that plaintiff should improve adequately without surgery to return to the workforce.  (Id.).

On April 3, 2002, Dr. Ray stated that plaintiff had not succeeded with physical therapy. (Tr. 463).  He noted that an MRI scan plaintiff underwent on April 2, 2002 revealed a L5-S1 disc causing most of plaintiff's difficulties, along with disc bulges at L3-4 and L4-5.  (Id.).  Dr. Ray recommended that plaintiff undergo surgery at least at the L5-S1 level.  (Id.).  Dr. Ray recommended that plaintiff undergo a discogram and obtain a second opinion from Dr. Chaudhary.  (Tr. 464).

Plaintiff presented to David R. Lange, M.D. on August 29, 2002, for an independent spine opinion in connection with her work-related injury.  (Tr. 406-09).  Plaintiff's neurologic and low back examinations were normal.  (Tr. 407).  Dr. Lange noted that it was unknown whether

Systems for Lawyers, § 6:27 (1993).

plaintiff's symptoms were caused by L3-4, L4-5 or L5-S1.  (Tr. 409).  Dr. Lange stated that it

was questionable in his opinion whether plaintiff would be a good surgical candidate.  (Id.).  He

noted that plaintiff could still suffer residual symptoms even if she were to undergo surgery.  (Id.).

 Dr. Lange expressed the opinion that plaintiff was not totally disabled at that time.  (Id.).  He

stated that plaintiff should be encouraged to be as active as possible and to lose weight.  (Id.).

Dr. Lange stated that plaintiff should lift no more than fifteen to twenty pounds and should avoid

repetitive bending at the low back.  (Id.).

On November 7, 2002, plaintiff presented to Christine M. Byrd, R.N., A.N.P, at the office

of neurologist Scott R. Gibbs.  (Tr. 400-04).  Ms. Byrd's impression was back and left leg pain

and paresthesia[13] that seemed to follow an S1 pattern, likely due to a herniated disc at L5-S1, with

no evidence of radiculopathy[14] or myelopathy;[15] and neck pain as well as left hand paresthesia.

(Tr. 403).  Ms. Byrd noted that plaintiff's cervical MRI revealed only mild spondylosis[16] and that

her left hand paresthesias were suggestive of carpal tunnel syndrome[17] but the clinical examination

was negative.  (Id.).  Ms. Byrd indicated that if plaintiff did not significantly improve, surgery

would be discussed.  (Id.).

Plaintiff presented to Dr. Gibbs on December 4, 2002, at which time she reported no

---

[13]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking).
Stedman's Medical Dictionary, 1425 (28th Ed. 2006).

[14]Disorder of the spinal nerve roots.  Stedman's at 1622.

[15]Disorder of the spinal cord.  Stedman's at 1270.

[16]Ankylosis of the vertebra.  Stedman's at 1813.

[17]The most common nerve entrapment syndrome, characterized by paresthesias, typically
nocturnal, and sometimes a sensory loss and wasting in the median nerve distribution in the hand.
Stedman's at 1892.

improvement.  (Tr. 395).  Dr. Gibbs noted that plaintiff had undergone a lumbar myelogram and post-myelogram CT scan on November 20, 2002, which revealed normal lumbar lordosis[18] and no spondylolisthesis;[19] a left paracentral disc herniation at L3-4, with mild central stenosis;[20] and a disc bulge at L5-S1.  (Tr. 396).  Dr. Gibbs' impression was back pain with left lower extremity pain and paresthesia that follow both an L4 and S1 pattern.  (Id.).  Dr. Gibbs recommended surgery and plaintiff agreed to proceed with surgery.  (Tr. 397).

On May 21, 2003, Dr. Gibbs noted that plaintiff had originally been scheduled for surgery in December 2002, but she had developed some respiratory problems and had been sick all winter.  (Tr. 393).  Plaintiff continued to complain of back pain that radiated into her left thigh, with numbness in her left foot.  (Id.).  Dr. Gibbs scheduled surgery for June 16, 2003.  (Tr. 394).

Plaintiff underwent a left L3-4 microdiscectomy[21] and left L5-S1 microlaminectomy,[22] on June 16, 2003.  (Tr. 335-39).

Plaintiff presented to Ms. Byrd on June 23, 2003, with complaints of severe back pain following surgery.  (Tr. 391).  Ms. Byrd indicated that an MRI of the lumbar spine may be necessary.  (Tr. 392).

Plaintiff presented to Ms. Byrd for a ten-day postoperative visit on June 26, 2003, at which time she reported some improvement in her low back pain.  (Tr. 389).  Plaintiff requested

---

[18]An anteriorly convex curvature of the vertebral column.  Stedman's at 1119.

[19]Forward movement of the body of one of the lower lumbar vertebrae on the vertebral below it or on the sacrum.  Stedman's at 1813.

[20]Narrowing of the spinal canal.  See Stedman's at 1832.

[21]Excision, in part or whole, of an intervertebral disc.  Stedman's at 550.

[22]Excision of a vertebral lamina.  Stedman's at 1046.

that a scheduled MRI be cancelled because her pain had improved. (Tr. 399). Ms. Byrd's impression was severe low back and incisional pain that seemed out of proportion with the surgery; on an improving trend. (Id.). Ms. Byrd continued plaintiff on Percocet. (Id.).

Plaintiff presented to Dr. Gibbs on July 21, 2003, for a post-operative visit, at which time plaintiff was crying and indicating that she had experienced no improvement. (Tr. 386). Plaintiff complained of "all over" pain. (Id.). Plaintiff indicated that her back pain was no worse since her last visit. (Id.). Dr. Gibbs noted that plaintiff was taking a low dose Fentanyl patch, Endocet,[23] and Prozac,[24] all prescribed by Dr. Glenn. (Id.). Dr. Gibbs examined plaintiff for fibromyalgia[25] trigger points, which revealed diffuse tender points in all areas. (Tr. 387). Dr. Gibbs' impression was: (1) status post left 3-4 and left L5-S1 microdiscectomy: since surgery, plaintiff has experienced an unusual amount of residual low back pain and has taken narcotic analgesic medications since surgery; (2) diffuse musculoskeletal pain: although she is tender over the traditional fibromyalgia trigger points, she is diffusely tender in other areas as well; and (3) depression. (Id.). Dr. Gibbs prescribed Elavil[26] and recommended an MRI of the lumbar spine. (Id.).

---

[23]Endocet is indicated for the relief of moderate to severe pain. See PDR at 1212.

[24]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See PDR at 1873-75.

[25]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution. Additionally, point tenderness must be found in at least 11 of 18 specified sites. See Stedman's at 725.

[26]Elavil is indicated for the treatment of depression. See PDR at 2213.

Plaintiff was admitted to Southeast Missouri Hospital on July 22, 2003, with complaints of chronic back pain, and chest pain associated with anxiety and depression. (Tr. 325). Upon admission, plaintiff was diagnosed with panic disorder[27] with anxiety, chronic back pain status post laminectomy, hypertension, obesity, and atypical chest pain. (Id.). Plaintiff underwent an MRI of the lumbar spine, which revealed typical postoperative changes, with no evidence of persistent or recurrent herniated nuclear pulposus. (Tr. 327). Plaintiff was discharged on July 24, 2003, at which time Dr. Gibbs noted that plaintiff was much better. (Tr. 327). Dr. Gibbs recommended that plaintiff follow-up with his office and with psychological counseling as scheduled. (Id.).

Plaintiff presented to Dr. Gibbs on September 4, 2003, at which time she reported ongoing back pain but indicated that she experienced relief of her leg pain and paresthesia. (Tr. 384). Plaintiff reported rare incidents of numbness in the left lower extremity. (Id.). Dr. Gibbs stated that overall, plaintiff was very happy with her surgical outcome. (Id.). Dr. Gibbs found that plaintiff's insight, judgment, mood, affect, intellectual function, attention span, concentration, and memory were normal. (Id.). Plaintiff's motor examination was normal and plaintiff had full strength of the lower extremities. (Id.). Plaintiff had some mild superficial tenderness to palpation of the back. (Tr. 385). Dr. Gibbs' impression was: (1) status post left L3-4 and left L5-S1 microdiscectomy with marked improvement in leg pain and paresthesia; (2) diffuse musculoskeletal pain that is likely related to myofacial discomfort; and (3) depression/anxiety. (Id.). Dr. Gibbs recommended that plaintiff start physical therapy for a home exercise program to increase flexibility and decrease discomfort. (Id.).

---

[27]Recurrent panic attacks that occur unpredictably. Stedman's at 570.

Plaintiff presented to the emergency room at Southeast Hospital on December 28, 2003, with complaints of an extremely abrupt onset of a severe headache. (Tr. 317). Upon arrival, plaintiff was screaming, hysterical, and uncooperative. (Id.). Intravenous pain medication was administered, which plaintiff indicated helped with her headache considerably. (Tr. 318). The examining physician recommended that plaintiff be admitted and have an MRI in the morning to rule out a bleed or vascular abnormality, but plaintiff decided to go home against medical advice. (Id.). The impression of the examining physician was cephalgia.[28] (Id.).

Plaintiff presented to Dr. Robert Bieser of Bieser & Phillips Premier Family Physicians on January 26, 2004, as a new patient. (Tr. 291). Dr. Bieser listed plaintiff's problems as: headaches, pituitary cyst, migraines, polycystic ovarian disease,[29] hypertension, chronic back pain, fibromyalgia, elevated triglyceride concentration, elevated liver function testing, glucose intolerance, and left ankle sprain. (Tr. 291). Plaintiff complained of a nervous psychiatric disorder, high blood pressure, difficulty breathing, history of migraines, and chronic back pain. (Id.). Dr. Bieser described plaintiff as tearful but stable and in no acute distress. (Id.). Dr. Bieser noted that he had reviewed a recent MRI scan, which revealed a possible pituitary cyst. (Id.). Dr. Bieser recommended additional testing and referred plaintiff to a chronic pain specialist. (Id.).

Plaintiff presented to Dr. Bieser on February 10, 2004, at which time she complained of pain over most of her body. (Tr. 291). Dr. Bieser's assessment was fibromyalgia and chronic pain syndrome. (Id.). He continued plaintiff on the Fentanyl patch, Prozac and Soma, and

---

[28]Headache. Stedman's at 347.

[29]Enlarged cystic ovaries; clinical features are abnormal menses, obesity, insulin resistance, and evidence of masculinization, such as extra facial and body hair. See Stedman's at 1396.

prescribed Keppra[30] and Percocet. (Id.). Dr. Bieser recommended physical therapy. (Id.).

Plaintiff presented to Dr. Bieser on February 26, 2004, at which time Dr. Bieser noted that plaintiff was on a considerable amount of narcotics, which he recommended that plaintiff should stop taking, as it was not necessary to treat fibromyalgia with heavy narcotics. (Id.). Plaintiff complained of sinus pain and pressure. (Id.). Dr. Bieser's assessment was acute sinusitis and chronic pain. (Id.). He refilled plaintiff's Percocet and prescribed Ambien for sleep. (Id.).

Plaintiff presented to Dr. Bieser on March 11, 2004, at which time Dr. Bieser stated that plaintiff had "drug addiction polypharmacy" secondary to what plaintiff described as chronic back pain and sinusitis. (Tr. 290). Dr. Bieser noted that Dr. Gibbs, plaintiff's neurosurgeon, had released her. (Id.). He stated that plaintiff had been receiving outpatient therapy through Cape Urgent Care and was on an extremely high number of controlled substances. (Id.). Plaintiff requested more drugs. (Id.). Dr. Bieser indicated that he had recently filled all of plaintiff's medications. (Id.). He called plaintiff's pharmacy and canceled all prescriptions and rewrote them as follows: Xanax (.5 mg),[31] Soma (350 mg), Percocet (325 mg), and Ambien (10 mg). (Id.). Dr. Bieser described plaintiff as nervous and anxious. (Id.). He noted that plaintiff was crying when he talked to her about her drug addiction. (Id.). Dr. Bieser's assessment was chronic pain, polypharmacy, drug addiction, history of fibromyalgia, and status post back surgery. (Id.). Dr. Bieser noted that he would monitor plaintiff's drug use carefully. (Id.). He indicated that plaintiff was to taper her Keppra, start Neurontin, and try to taper off her drugs slowly. (Id.).

---

[30]Keppra is indicated for the treatment of seizures in adults with epilepsy. See PDR at 3235.

[31]Xanax is indicated for the management of anxiety disorder. See PDR at 2764.

Plaintiff presented to Barbara L. Morgan, M.Ed., LPC, LCSW, at Community Counseling Center on March 23, 2004. (Tr. 358-60). Plaintiff reported episodes of depression beginning in November 2003 and "bottoming out" one month prior. (Tr. 358). Plaintiff reported some improvement at the time of her examination. (Id.). Plaintiff indicated that she had experienced two episodes of intense anxiety in the prior six months. (Id.). Ms. Morgan noted that plaintiff had been seen for a consult by Dr. Lake at Southeast Missouri Hospital, who recommended that plaintiff pursue counseling. (Tr. 359). Ms. Morgan described plaintiff as somewhat ill-kempt. (Id.). Ms. Morgan found plaintiff's intellectual functioning to be in the average range. (Id.). Plaintiff described her concentration as "not bad," and described her short-term memory as "worse." (Id.). Ms. Morgan noted that plaintiff had experienced numerous losses, was experiencing financial stressors, and was in the process of tapering off pain medication. (Tr. 360). Ms. Morgan diagnosed plaintiff with recurrent moderate major depressive disorder[32] and assessed

---

[32]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. See Stedman's at 515.

a current GAF score[33] of 58,[34] with the highest score in the past year of 65.[35]  (Id.).  Ms. Morgan

recommended individual counseling and a psychiatric consult with Dr. McCool.  (Id.).

On April 12, 2004, Dr. Bieser stated that plaintiff had been compliant with his plan

regarding tapering her medications.  (Tr. 289).  Plaintiff had come off of her Keppra, Fentanyl

patch, and Soma.  (Id.).  Plaintiff indicated that the Neurontin helped with her pain.  (Id.).  Dr.

Bieser's assessment was chronic pain, history of chronic back pain, seasonal allergies, and nasal

congestion.  (Id.).  He increased plaintiff's Neurontin and decreased her Prozac.  (Id.).  On May

7, 2004, Dr. Bieser indicated that the Neurontin was helping with plaintiff's chronic pain.  (Id.).

He increased plaintiff's dosage of Neurontin.  (Id.).

Plaintiff presented to Dr. Ken Phillips on May 27, 2004, at which time she complained of

neck pain.  (Tr. 288).  Dr. Phillips described plaintiff as somewhat anxious and mildly depressed,

with no homicidal or suicidal thoughts.  (Id.).  Upon physical examination, plaintiff had some

---

[33]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool
wherein an examiner is to "consider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness" which does "not include impairment in
functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[34]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or
school functioning (e.g., few friends, conflicts with peer or co-workers)."  DSM-IV at 32.

[35]A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g. depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within household), but generally functioning pretty well, has some meaningful
interpersonal relationships." DSM-IV at 32

tenderness in the neck range, with decreased range of motion. (Id.). Dr. Phillips refilled the Percocet, increased the Neurontin, and started plaintiff on Soma. (Id.).

Plaintiff presented to Robert E. McCool, M.D., Medical Director at Community Counseling Center, on June 11, 2004 for a psychiatric evaluation. (Tr. 355-57). Plaintiff reported difficulties with chronic insomnia for many years. (Tr. 355). Plaintiff indicated that she had "hit a rough spot for a while" but felt that she had made some improvement. (Id.). Plaintiff denied any suicidal ideation, plan or intention. (Tr. 356). Plaintiff reported occasional racing thoughts but indicated that the level of her depression had not been as intense. (Id.). Plaintiff was taking Prozac, Ambien, and Xanax. (Id.). Dr. McCool described plaintiff as cooperative with the interview process. (Id.). Plaintiff had logical flow of thought, and a broad, euthymic, non-labile affect. (Id.). Plaintiff described her mood as "better." (Id.). Plaintiff's thought content revealed no evidence of delusions or hallucinations. (Id.). Dr. McCool described plaintiff's general intellectual functioning as average and her insight and judgment appropriate. (Id.). Dr. McCool diagnosed plaintiff with dysthymia[36] with episodes of major depression, and assessed a GAF score of 60. (Tr. 357). Dr. McCool recommended that plaintiff continue the Prozac, use the Xanax sparingly, and start Trazodone. (Id.). He also recommended that plaintiff continue individual therapy with Ms. Morgan. (Id.). Plaintiff continued to see Dr. McCool regularly through November 2006. (Tr. 258-67, 344-54). Dr. McCool treated plaintiff's dysthymia with Prozac,

---

[36]A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness. See Stedman's at 602.

Xanax and Trazodone.  (Tr. 262-67, 344-54).

Plaintiff presented to Dr. Bieser on June 16, 2004, at which time he assessed chronic pain, chronic use of narcotics for pain control, insomnia, and hyperlipidemia.  (Tr. 287).  He refilled the Percocet and Soma and increased the Neurontin.  (Id.).  On June 29, 2004, plaintiff complained of urinary symptoms.  (Id.).  Dr. Bieser's assessment was urinary tract infection, left trapezius spasm, chronic pain syndrome, and vaginal itching.  (Id.).  He prescribed antibiotics for the infection.  (Id.).  On July 12, 2004, plaintiff requested an increased of her Neurontin due to neuropathic pain at night from her chronic pain.  (Id.).  Dr. Bieser's assessment was chronic pain, resolved urinary tract infection neuropathy, hyperlipidemia, and depression.  (Id.).  Dr. Bieser increased plaintiff's Neurontin.  (Id.).  On August 2, 2004, Dr. Bieser noted that plaintiff had gone through a month supply of Percocet in twenty days.  (Tr. 286).  Plaintiff complained of chronic back pain and leg pain.  (Id.).  Dr. Bieser's assessment was chronic pain, chronic back pain, possible fibromyalgia, and excessive use of pain medications.  (Id.).  Dr. Bieser referred plaintiff to a pain management specialist.  (Id.).  On September 22, 2004, Dr. Bieser indicated that plaintiff has seen Dr. Moore for her chronic pain and that plaintiff reported that he offered her nothing in the way of pain treatment.  (Id.).  Dr. Bieser stated that plaintiff had given him permission to speak with her psychiatrist, Dr. McCool.  (Id.).  Dr. Bieser noted that plaintiff was off the Percocet and that plaintiff was upset that she had to stop her medications.  (Id.).  Dr. Bieser's assessment was chronic pain, fibromyalgia and depression.  (Id.).  He started plaintiff on

Guaifenesin[37] for her fibromyalgia and reduced her dosage of Soma. (Id.). Dr. Bieser prescribed Darvocet[38] on October 4, 2004. (Id.). On December 27, 2004, plaintiff requested that she be switched to Percocet due to the side effects of Darvocet. (Tr. 285). Dr. Bieser discontinued the Darvocet and started plaintiff on Percocet. (Id.).

Plaintiff presented to Dr. Phillips on January 14, 2005, at which time she complained of pain in her hand joints. (Tr. 284). Dr. Phillips described plaintiff as mildly anxious. (Id.). Upon examination, plaintiff had intact range of motion, with some joint pain and discomfort. (Id.). Dr. Phillips continued plaintiff's medications and indicated that plaintiff would be tested for arthritis in the future. (Id.). On March 21, 2005, plaintiff complained of ear infections and sinus congestion. (Tr. 282). Dr. Phillips described plaintiff's mental state as somewhat anxious, with no real depression. (Id.). Dr. Phillips prescribed antibiotics and indicated that plaintiff's high blood pressure may need to be treated if it did not go down. (Id.). On April 11, 2005, plaintiff reported feeling much better. (Tr. 281). Plaintiff had some back tenderness and decreased range of motion. (Id.). Dr. Phillips continued plaintiff's medications. (Id.). On May 9, 2005, plaintiff complained of sinus pressure and nasal congestion. (Tr. 280). Plaintiff reported that the Darvocet did not provide relief and requested Percocet. (Id.). Dr. Phillips discontinued the Darvocet and started plaintiff on Percocet. (Id.). On June 3, 2005, plaintiff indicated that the

---

[37]Guaifenesin contains hydrocodone and is indicated for the treatment of upper and lower respiratory tract congestion. See PDR at 1215.

[38]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 402.

Soma was making her tired and requested Skelaxin.[39]  (Tr. 279).  Dr. Phillips described plaintiff's

mental state as mildly anxious with no real depression.  (Id.).  Plaintiff had point tenderness over

the lower back.  (Id.).  Dr. Phillips started plaintiff on Skelaxin.  (Id.).  On June 27, 2005, plaintiff

reported that she was doing okay overall.  (Tr. 278).  Plaintiff reported lower quadrant abdominal

pain, for which Dr. Phillips referred her to a gynecologist.  (Id.).  Plaintiff indicated that the Soma

was most effective.  (Id.).  Dr. Phillips refilled plaintiff's Soma and Percocet.  (Id.).  On July 21,

2005, plaintiff complained of sinus problems.  (Tr. 276).  Dr. Phillips described plaintiff's mental

state as slightly anxious.  (Id.).  Dr. Phillips prescribed medications for plaintiff's sinus problems

and high blood pressure, and refilled her Percocet and Soma.  (Id.).  On August 1, 2005, Dr.

Phillips called in a prescription for Neurontin.  (Tr. 275).  On August 15, 2005, Dr. Phillips noted

that plaintiff's blood pressure was high and that plaintiff had not been taking her blood pressure

medication.  (Tr. 274).  Plaintiff had no real anxiety or depression.  (Id.).  Dr. Phillips prescribed

Zestril,[40] decreased plaintiff's Percocet and started a Fentanyl patch.  (Id.).

Plaintiff presented to Anthony Charles Zoffuto, M.D. of Occupational Medical Services

LLC on August 17, 2005, for an examination at the request of plaintiff's attorney.  (Tr. 305-07).

Upon physical examination, plaintiff's forward flexion indicated that she had a markedly restricted

range of motion of the lumbosacral spine to about twenty percent of normal.  (Tr. 303).  Plaintiff

was able to stand on either foot alone but could only squat to about ten percent of expected.

---

[39]Skelaxin is indicated for the relief of acute, painful musculoskeletal conditions.  See PDR
at 1793.

[40]Zestril is indicated for the treatment of hypertension.  See PDR at 667.

(Id.).  Plaintiff had preserved strength of her quadriceps and hamstring muscles as well as the muscles of the lower leg, with no edema of the lower extremities.  (Id.).  Dr. Zoffuto expressed the opinion that plaintiff suffered a disabling injury on December 18, 2001.  (Tr. 307).  Dr. Zoffuto stated that the medical and surgical remedies carried out have been ineffective in relieving plaintiff's disabling pain of her low back and left lower extremity.  (Id.).

Plaintiff presented to Dr. Phillips on August 29, 2005, at which time plaintiff indicated that the Fentanyl patch was helping and requested a higher dosage.  (Tr. 273).  Plaintiff reported feeling much better, although she indicated that she overdid herself the prior weekend and was experiencing back and neck pain.  (Id.).  Plaintiff's blood pressure had gone down.  (Id.).  Dr. Phillips increased the dosage of plaintiff's Fentanyl patch and recommended that plaintiff cut back on the Percocet.  (Id.).  On September 19, 2005, plaintiff reported increased back pain after falling into a chest.  (Tr. 272).  Dr. Phillips indicated that plaintiff showed signs of slight anxiety but no real depression.  (Id.).  Plaintiff had some point tenderness over the lower back down into the left gluteal region.  (Id.).  Dr. Phillips continued plaintiff's medications and recommended that plaintiff cut back on her smoking.  (Id.).  Plaintiff presented with complaints of sore throat and pain on September 27, 2005.  (Tr. 271).  Dr. Phillips prescribed medications for plaintiff's respiratory infection.  (Id.).  On October 12, 2005, plaintiff reported feeling okay overall.  (Tr. 270).  Plaintiff had some tenderness over the lower lumbar spine with decreased range of motion.  (Id.).  Plaintiff's mental state was described as mildly anxious with no real depression.  (Id.).  Dr. Phillips refilled plaintiff's Fentanyl patch, Soma, and Percocet.  (Id.).  On November 3, 2005, plaintiff reported doing about the same overall.  (Tr. 269).  Dr. Phillips refilled plaintiff's Fentanyl

patch, Percocet, and Soma. (Id.). On November 22, 2005, plaintiff indicated that she was doing the same overall. (Tr. 250). Plaintiff reported difficulty sleeping. (Id.). Dr. Phillips refilled plaintiff's medications and prescribed Ambien. (Id.). On December 14, 2005, plaintiff complained of sinus problems. (Tr. 249). Dr. Phillips prescribed medication for a respiratory infection and refilled plaintiff's other medications. (Id.). On January 6, 2006, plaintiff indicated that she was doing okay overall. (Tr. 248). Upon examination, plaintiff had some point tenderness and decreased range of motion of the lower back. (Id.). Dr. Phillips continued plaintiff on her prescription regimen. (Id.).

Joan Singer, Ph.D. completed a Psychiatric Review Technique on January 6, 2006. (Tr. 170-83). Dr. Singer found that plaintiff suffered from major depressive disorder, which resulted in mild limitations in her activities of daily living and maintaining social functioning; and moderate limitations in maintaining concentration, persistence, or pace. (Tr. 180). Dr. Singer also completed a Mental Residual Functional Capacity Assessment, in which she expressed the opinion that plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. 192).

Plaintiff presented to Dr. Philips on January 31, 2006, at which time she complained of pain in the lower back with decreased range of motion and neuropathy and pain going down the lower extremities. (Tr. 247). Dr. Phillips continued plaintiff on her medication regimen. (Id.).

On February 10, 2006, plaintiff underwent a Vocational Rehabilitation Evaluation at the request of her attorney. (Tr. 147-61). Timothy G. Lalk, Vocational Rehabilitation Counselor,

expressed the opinion that plaintiff was "unable to secure and maintain employment in the open labor market and is not able to compete for any position." (Tr. 160). Mr. Lalk found that plaintiff was unable to maintain even sedentary employment. (Tr. 160).

On February 22, 2006, plaintiff presented to Dr. Phillips with complaints of sinus problems and pain in the lower back. (Tr. 246). Dr. Phillips refilled plaintiff's medications and prescribed medication for plaintiff's sinus problems. (Id.). On March 13, 2006, plaintiff complained of lower abdominal pain, urinary frequency, left shoulder pain, and left arm pain. (Tr. 245). Upon examination, plaintiff had some decreased range of motion of the left shoulder and tenderness and decreased range of motion of the lower lumbar spine. (Id.). Dr. Phillips took a urine culture, recommended that plaintiff do exercises for her left shoulder range of motion, and refilled plaintiff's other medications. (Id.). On April 10, 2006, plaintiff presented to Dr. Phillips requesting medication refills. (Tr. 244). Plaintiff indicated that her daughter had been taking her medications, which caused her shortage of medications the prior two months. (Id.). Dr. Phillips gave plaintiff a one-month supply of refills. (Id.). Dr. Phillips advised plaintiff to monitor her medications closely and plaintiff indicated that she would keep her medications in a locked box. (Id.). On May 3, 2006, plaintiff reported that she was doing okay. (Tr. 243). Upon examination, plaintiff had point tenderness and pain over the lower back into the gluteal regions, with decreased range of motion. (Id.). Dr. Phillips refilled plaintiff's medications. (Id.).

Plaintiff presented to Dr. McCool on September 26, 2006, at which time Dr. McCool noted that plaintiff's mood was more depressed and that plaintiff was feeling overwhelmed. (Tr. 261). Dr. McCool changed plaintiff's diagnosis from dysthymia to major depression, discontinued

the Prozac and prescribed Cymbalta.  (Id.).  Dr. McCool assessed major depression recurrent in October 2006 and November 2006, and continued plaintiff on her medication regimen.  (Tr. 258-59).

Plaintiff presented to Jerrell L. Driver, Ph.D. for a psychological evaluation at the request of the state agency on March 22, 2007 and March 23, 2007.  (Tr. 223-39).  Plaintiff indicated that she periodically experienced fatigue and depression.  (Tr. 223).  Dr. Driver described plaintiff as cordial, personable, and cooperative during the interview.  (Tr. 224).  Plaintiff reported that she had stopped seeing Dr. McCool three to four months prior due to a change in her insurance.  (Id.).  Plaintiff indicated that the Trazodone she was taking helped.  (Id.).  Dr. Driver found that plaintiff demonstrated no specific difficulties with interacting in a socially appropriate manner but seemed to suggest difficulties with physical ambulation.  (Tr. 228).  Dr. Driver observed no perceptual disturbances, or gross limitations in short-term or long-term memory.  (Id.).  Dr. Driver found plaintiff's intellectual functioning to be above-average.  (Id.).  Dr. Driver stated that plaintiff exhibited good reality contact with no specific episodes of psychotic behavior.  (Tr. 229).  Plaintiff's fund of general information and calculation skills were described as "good," and plaintiff's ability to engage in abstract thinking was described as "above average."  (Id.).  Dr. Driver found that plaintiff's judgment was good, although her insight appeared to be diminished.  (Tr. 230).  Plaintiff's ability to recognize and discriminate critical differences was found to be intact.  (Id.).  Dr. Driver administered the WAIS-III and indicated that plaintiff appeared to perform to the best of her ability and that the results were reliable.  (Id.).  The WAIS-III revealed plaintiff was functioning within the average range of intellectual capacity with a full scale IQ of 99.  (Tr. 232).  Dr. Driver administered the Weshsler Memory Scale (WMS-III),which revealed no gross levels of deficiency within any of the areas of memory functioning assessed, and even

revealed superior performance in some areas. (Tr. 234). Dr. Driver administered the MMPI, which strongly suggested the probability of psychotic symptoms. (Tr. 239). Dr. Driver diagnosed plaintiff with adjustment disorder,[41] chronic, with mixed anxiety and depressed mood; personality disorder,[42] not otherwise specified, with mixed features; and assessed a GAF score of 50.[43] (Id.). Dr. Driver recommended that plaintiff be monitored for depressive features and the possibility of self-injury, although at the time she appeared to be showing improvement and her activity level was increasing. (Id.). Dr. Driver stated that, based upon the results of the psychological assessment, it appeared that there may be some features of psychotic functioning or behavioral decompensation suggestive of psychotic intensity. (Id.). Dr. Driver emphasized that this was not observed within the context of the clinical interview or clinical assessment. (Id.). He stated that no detection of present nor prior psychotic functioning was observed but the valid MMPI strongly suggested the probability of psychotic symptoms. (Id.). Dr. Driver stated that it was possible that there was a reactive psychotic condition or that the psychotic process was in remission. (Id.).

Dr. Driver also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff's mental impairments did not affect her ability to understand, remember, and carry out instructions; or interact appropriately

---

[41]A group of mental and behavioral disorders in which the development of symptoms is related to the presence of some environmental stressor or life event and is expected to remit when the stress ceases. Stedman's at 567.

[42]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning. Stedman's at 570.

[43]A GAF score of 41 to 50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." DSM-IV at 32.

with supervision, co-workers, and the public.  (Tr. 241-42).  Dr. Driver stated that plaintiff's physical limitations appeared to be her greatest problem.  (Tr. 242).

## **The ALJ's Determination**

The ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act through March 31, 2007.

2.      The claimant has not engaged in substantial gainful activity since December 18, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine and fibromyalgia (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift/carry 10 pounds frequently and 20 pounds occasionally and to sit, stand and/or walk about six hours total in an eight-hour workday.  The claimant is able to occasionally climb ramps and stairs but never able to climb ladders, ropes or scaffolds.  She must avoid concentrated exposure to extremely cold temperatures and vibrations of the body.  Exposure to the low density hum of a machine is tolerable but cannot be exposed to any vibrations that would significantly jolt or shake the body.  She is unable to perform any work in which balancing of the body is critical to the performance of her job duties.  She has moderate limitations in her ability to understand, remember and carry out detailed instructions and in her ability to maintain attention/concentration for extended periods of time.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 4, 1966 and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from December 18, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-22).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on September 8, 2005, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on September 8, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 22).

## Discussion

**A.      Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of

whether the claimant is able to perform other work in the national economy taking into

consideration the claimant's residual functional capacity, age, education and work experience.

See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at

which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform

other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation.  Plaintiff also contends that the ALJ erred in evaluating the medical evidence.  The undersigned will address plaintiff's claims in turn.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ's credibility analysis was erroneous.  Specifically, plaintiff contends that the ALJ did not consider plaintiff's subjective complaints of pain in making his credibility determination.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 19-21). The ALJ first found that the objective medical evidence did not support the severity of plaintiff's complaints. (Tr. 20). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ noted that Dr. Phillips' most recent report indicates that plaintiff had some tenderness and limitation of motion in her back, but examination of the extremities was normal. (Tr. 20, 243). There was no indication that plaintiff had any loss of strength, muscle atrophy, significant muscle spasm, or neurological abnormalities. (Id.).

The ALJ next found that plaintiff's allegation of a disabling mental impairment lacked credibility. (Tr. 20). The ALJ noted that plaintiff stopped seeing her psychiatrist, Dr. McCool, altogether. (Id.). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

Plaintiff alleged that she stopped seeing her psychiatrist only because she was unable to afford treatment. If a claimant is unable to follow a prescribed regimen of medication and therapy because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). The fact that a claimant is under financial strain, however, is not determinative. Id. A claimant's alleged failure to seek treatment due to financial difficulties is not credible when the claimant did not attempt to obtain any low-cost medical treatment. Id. at 386-87. Here, as the ALJ points out, there is nothing in the record to indicate that plaintiff was denied treatment due to lack of finances or that she attempted to obtain low-cost treatment. Further, the ALJ pointed out that the consultative psychologist, Dr. Driver, found after examining plaintiff for two days that plaintiff's mental impairments resulted in no work-related limitations. (Tr. 241-42).

The ALJ next discussed plaintiff' daily activities. (Tr. 20). The ALJ stated that plaintiff's testimony was somewhat inconsistent in that she testified that she usually spent most of her day in bed, but then testified that she attempts many household tasks such as washing dishes and washing clothes, gardening, and shopping. (Id.). The ALJ found that plaintiff's daily activities suggest that she is capable of performing a limited range of light work activities. (Id.). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in these activities on a regular basis appears inconsistent with the inability to work.

Plaintiff argues that the ALJ erred in failing to address the side effects of plaintiff's medications. Although the ALJ did not discuss plaintiff's alleged side effects, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors

and gives good reasons for discrediting a claimant's complaints. See <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001). Plaintiff points to medical expert Dr. Alex's testimony at the hearing that, given the list of medications plaintiff was taking, he did not know how plaintiff was functioning. (Tr. 47). The medical record, however, reveals that plaintiff complained of side effects from her medication on only one occasion. (Tr. 279). Further, Dr. Driver found that plaintiff had no limitations in her memory, intellectual functioning, ability to understand and carry out instructions, or interact appropriately in a work setting, despite the medications she was taking. (Tr. 228, 241). Given the lack of evidence in the record of significant side effects from plaintiff's medications, the ALJ did not err in failing to discuss this factor.

## 2.   <u>Medical Evidence</u>

Plaintiff next argues that the ALJ erred in evaluating the medical evidence. Specifically, plaintiff contends that the ALJ failed to discuss the opinion of Dr. Anthony Zoffuto or vocational rehabilitation counselor Timothy Lalk.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." <u>Rhodes v. Apfel</u>, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting <u>Metz v. Halala</u>, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a

whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may

be discounted or disregarded where other "medical assessments 'are supported by better or more

thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Plaintiff saw Dr. Zoffuto, of Occupational Medical Services LLC, on August 17, 2005, for

an examination at the request of plaintiff's attorney. (Tr. 305-07). Dr. Zoffuto expressed the

opinion that plaintiff suffered a disabling injury on December 18, 2001. (Tr. 307). Mr. Lalk, a

vocational rehabilitation counselor, expressed the opinion that plaintiff was "unable to secure and

maintain employment in the open labor market and is not able to compete for any position." (Tr.

160).

The undersigned finds that the ALJ did not err in failing to discuss the opinions of Dr.

Zoffuto or Mr. Lalk. The ALJ was not required to mention each medical report. See Wheeler v.

Apfel, 224 F.3d 891, 895 n. 3 (8th Cir. 2000); Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)

("[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss

every piece of evidence submitted..[and] [a]n ALJ's failure to cite specific evidence does not

indicate that such evidence was not considered"). Both of these providers examined plaintiff on

only one occasion. Further, a physician's statement that a claimant is disabled or cannot be

gainfully employed receives no deference because it invades the province of the Commissioner to

make the ultimate disability determination. See Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th

Cir. 2002).

After properly assessing plaintiff's credibility and summarizing the medical evidence, the

ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant
> has the residual functional capacity to lift/carry 10 pounds frequently and 20 pounds
> occasionally and to sit, stand and/or walk about six hours total in an eight-hour workday.
> The claimant is able to occasionally climb ramps and stairs but never able to climb

ladders, ropes or scaffolds. She must avoid concentrated exposure to extremely cold temperatures and vibrations of the body. Exposure to the low density hum of a machine is tolerable but cannot be exposed to any vibrations that would significantly jolt or shake the body. She is unable to perform any work in which balancing of the body is critical to the performance of her job duties. She has moderate limitations in her ability to understand, remember and carry out detailed instructions and in her ability to maintain attention/concentration for extended periods of time.

(Tr. 19).

The residual functional capacity formulated by the ALJ is consistent with the medical record. With respect to plaintiff's physical limitations, consultative examiner Dr. Lange found that plaintiff was capable of lifting up to twenty pounds in August 2002, prior to plaintiff's surgery. (Tr. 409). Plaintiff's treating neurosurgeon, Dr. Gibbs, released plaintiff from his care on September 4, 2003, at which time he noted that plaintiff was happy with her surgical outcome. (Tr. 384). Plaintiff's motor examination was normal and plaintiff had full strength of the lower extremities, with only mild superficial tenderness to palpation of the back. (Tr. 384-85). The medical expert, Dr. Alex, testified that plaintiff had the physical limitations found by the ALJ in his residual functional capacity. (Tr. 50).

With regard to plaintiff's mental impairments, Dr. Alex recommended that plaintiff undergo an additional psychological evaluation. (Tr. 51). Based on Dr. Alex's recommendation, the ALJ ordered a psychological evaluation. Dr. Driver examined plaintiff and administered psychological testing over a two-day period. (Tr. 223-39). Dr. Driver found that plaintiff demonstrated no difficulties with interacting in a socially appropriate manner or with short-term or long-term memory. (Tr. 228). Psychological testing revealed that plaintiff was functioning within the average range of intellectual capacity with a full scale IQ of 99. (Tr. 232). Dr. Driver administered the MMPI, which strongly suggested the probability of psychotic symptoms, although no such symptoms were observed by Dr. Driver during the interview. (Id.). Dr. Driver

completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff's mental impairments did not affect her ability to understand, remember, and carry out instructions; or interact appropriately with supervision, co-workers, and the public. (Tr. 241-42). Even though Dr. Driver found that plaintiff had no work-related mental limitations, the ALJ gave plaintiff the benefit of the doubt and found moderate limitations in the ability to understand, remember and carry out detailed instructions and in the ability to maintain attention/concentration for extended periods of time. The record does not support the presence of greater limitations than those found by the ALJ.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this __28th__ day of September, 2009.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE